## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| RITA LAMOUREUX, *as trustee of the Rita Lamoureux Trust*, | Civil No. 14-1488 (JRT/BRT) |
| Plaintiff, | |
| v. | |
| MPSC, INC., *a/k/a Meat Processing Service Corporation, Inc.*, | **MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| Defendant and Third-Party Plaintiff, | |
| v. | |
| RITA LAMOUREUX, *individually*, | |
| Third-Party Defendant. | |

Kaisa M. Adams and Rolf E. Gilbertson, **ZELLE HOFMANN VOELBEL & MASON LLP**, 500 Washington Avenue South, Suite 4000, Minneapolis, MN 55415, for plaintiff and third-party defendant.

Patrick J. Rooney, **FAFINSKI MARK & JOHNSON, PA**, 775 Prairie Center Drive, Suite 400, Eden Prairie, MN 55344, for defendant and third-party plaintiff.

This is a case about the continued viability of a contract between a start-up turned successful company and its angel investor. Twenty-eight years ago, plaintiff Rita Lamoureux's ("Rita") late-husband, John Lamoureux ("John"), invested $150,000 with defendant Meat Processing Service Corporation ("MPSC"), and MPSC promised that it

would pay a $1.50 royalty each time the company's patented "Rinse & Chill service" was used by one of its clients.[1]   Crucially, the contract did not state an end date.  After John died in 2012, MPSC had Rita sign an indemnity agreement with broad, sweeping language.   The company then told her that it had interpreted the original royalty agreement as terminable at will, and the company stopped making payments.  Rita filed this action alleging breach of contract.

The parties have each moved for summary judgment.   Because the royalty agreement in question cannot be terminated at will by either party acting alone, and because the indemnity agreement cannot be enforced to require Rita to indemnify MPSC for its breach of the royalty agreement, the Court will grant Rita's motion and deny MPSC's motion.

# BACKGROUND

## I.   FACTUAL BACKGROUND

Defendant MPSC is a Minnesota corporation with its principal place of business located in Wisconsin.   The key to MPSC's business is providing cattle slaughtering facilities with a patented meat "processing" technique called the "Rinse & Chill service":  After a cow is slaughtered, blood is removed via a cardiovascular injection.   This injection – mainly water – eases the separation of the hide from the carcass, making the

---

[1] Rita filed this action in her capacity as the sole trustee of her eponymous trust, but MPSC later impleaded her in her personal capacity.  For the sake of clarity, the Court will refer to her in each capacity as Rita, except when relevant.

meat more tender and colorful.  The process purports to improve the amount and quality of the beef removed from the animal.

In 1987, MPSC was a start-up with limited capital and in need of funding.  MPSC solicited investors, and Floridian John Lamoureux responded.  The two entered into a written Royalty Agreement dated August 13, 1987, whereby John would pay MPSC $150,000 to "purchase" the right to a $1.50 payment for every animal processed anywhere in the world with the Rinse & Chill service "as long as this agreement remains in effect."  (Aff. of Rolf E. Gilbertson ("Gilbertson Aff."), Ex. 3 ("Royalty Agreement") at 1, Aug. 22, 2015, Docket No. 30.)[2]  The contract included three termination scenarios:

> 5.  This agreement shall terminate upon the happening of any of the following events:
>
> > (a)   The dissolution, bankruptcy, insolvency or receivership of MPSC;
> >
> > (b)   The demise of the legal holder(s) of this agreement under such circumstances that no survivor or survivors of the holder(s) can be located;
> >
> > (c)   Written agreement of MPSC and the legal holder(s) of this agreement.

(*Id.* at 2.)  The parties memorialized nothing else about the contract's termination.  The Royalty Agreement also stated that "MPSC agrees there shall be no restriction to the transfer of rights granted by this agreement."  (*Id.*)

---

[2] All citations to affidavits and exhibits are in reference to the internal pagination of the respective documents.

In 2005, eighteen years after the Royalty Agreement was signed, John Lamoureux had yet to receive any royalty payments from MPSC even though Rinse & Chill had been used both at home and abroad by that point. John repeatedly requested that MPSC transfer his rights in the Royalty Agreement to his trust. (*Id.*, Ex. 11 (Fax from John Lamoureux to MPSC Pres. Warner Ide (June 29, 2005)) ("I also want the royalty agreement with MPSC, Inc. transferred to the trust named above."); *id.*, Ex. 10 (Email from Warner Ide to John Lamoureux (June 14, 2005)) (quoting an earlier email from John Lamoureux stating, "I also want to transfer my royalty agreement into either my Revocable Trust or my Revocable Qualified Sub Chapter S Trust").)

MPSC's board of directors approved John's requested transfer – but no one from the company informed John. (*See id.*, Ex. 13 (Email from J. Dixon Tews, MPSC Att'y, to John Lamoureux (Nov. 10, 2005)) (failing to mention the Board's approval of the Royalty Agreement); *id.*, Ex. 20 (Email from Warner Ide to Vern Swanson, (May 7, 2012)) ("May 7, 2012 Ide Email") at 2) (quoting an earlier email, where Tews suggested that MPSC did not provide John notice of the Board's approval of the Royalty Agreement transfer).) As a result, John never submitted the forms MPSC needed to formalize the transfer.

John passed away in April 2012. Not long after, Rita's lawyer and her son-in-law contacted MPSC President Warren Ide to settle John's affairs and confirm that the Royalty Agreement had in fact been transferred to the Lamoureux trust. When Ide responded, he told them of the Board's approval, its subsequent failure to notify John, and the now noted absence of the transfer forms. As Ide explained, the transfer was

approved but never given legal effect.  (*See* May 7, 2012 Ide Email at 1-3.)   Rita requested that MPSC acknowledge the transfer after the fact.

After receiving Rita's request, Ide contacted MPSC's lawyer, J. Dixon Tews, for advice.  Tews wrote Ide in a then-confidential email[3] that the company faced possible legal risk if it were "to now acknowledge such a transfer," presumably because of Tews's failure to notify John of the Board's 2005 approval:  "For example an heir of the estate of Mr. Lamoureux could come back later and claim that they were entitled to this asset, rather than the trust."  (*Id.*, Ex. 21 (Email from Warren Ide to Vern Swanson (May 8, 2012) ("May 8, 2012 Ide Email")) at 2.)  Tews advised that before MPSC acknowledge the transfer, Ide should have Rita sign a release and indemnification agreement.  (*Id.*)

Tews drafted the Indemnity Agreement, and Ide sent it to Rita's son-in-law, stating, "MPSC **needs** to have a formal liability release agreement for Rita to sign."  (*Id.* at 1 (emphasis added).)  The text of the Indemnity Agreement stated that MPSC was "release[d]" from "any and all" claims that Rita could bring in her own capacity or as the trustee of John's trust.  (*Id.*, Ex. 24 (Release and Indemnity Agreement ("Indemnity Agreement")) at 2.)  It also stated that Rita and the Lamoureux trust must indemnify MPSC "from any and all claims . . . in connection with the ownership or transfer of the Royalty Agreement or otherwise related to or arising from the Royalty Agreement."  (*Id.*) Rita signed the Indemnity Agreement; MPSC was not a signatory.  (*Id.* at 3.)

---

[3] MPSC waived its privileges to the email from Tews when Ide removed the email's status as a confidential communication by forwarding it to Rita's son-in-law, Vern Swanson.

## II.     PROCEDURAL BACKGROUND

In March and April 2013, Ide met with Rita and notified her that MPSC had determined that because the Royalty Agreement did not contain an end date, MPSC had the right to terminate the contract at will after providing reasonable notice.  (*Id.*, Ex. 27 (Letter from Warren Ide to Rita Lamoureux (April 25, 2013)) at 1-2.)  MPSC decided to terminate the contract, and stopped making payments on or around April 25, 2013.  (*See id.*)  MPSC and Rita eventually reached a partial settlement covering royalties owed to Rita prior to April 25, 2013, but the settlement preserved all claims arising on and after that date.  (Gilbertson Aff. ¶¶ 4-7.)

Rita filed the present action alleging breach of contract not quite a year later in her capacity as the trustee of her trust.  The Court has diversity jurisdiction.  She requests more than $430,000 in damages for unpaid royalties, as well as a declaratory judgment that the Royalty Contract remains enforceable.

MPSC counterclaimed and impleaded Rita in her personal capacity, alleging that Rita breached the Indemnity Agreement by filing this action.  MPSC seeks indemnification for any costs and damages associated with this action, including attorney's fees, as well as a declaratory judgment stating that the Royalty Agreement was lawfully terminated.

## ANALYSIS

This case involves two contracts:  the Royalty Agreement and the Indemnity Agreement.  Each party has moved for summary judgment on all claims, and the parties

agree there are no genuine issues of material fact. Only questions of law are disputed. The primary questions before the Court are whether MPSC lawfully terminated the Royalty Agreement, and if not, whether the Indemnity Agreement can be enforced to require Rita to indemnify MPSC for its breach of the Royalty Agreement.

## I.      STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.    THE ROYALTY CONTRACT

### A.    Contract Interpretation

In interpreting a written contract, the Court first examines the text of the contract in order to identify the parties' intent.  *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582 (Minn. 2010).  The words and phrases of a contract are given a meaning "in accordance with the obvious purpose of the contract . . . as a whole."  *Savela v. City of Duluth*, 806 N.W.2d 793, 801 (Minn. 2011) (quoting *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 324 (Minn. 2003)); *see also* 1 *Williston on Contracts* § 4:22 (4th ed. 2002) [hereinafter *Williston*] (stating that a contract must be interpreted "with reference to its subject matter").  A Court may resolve the interpretation of a contract on summary judgment if the terms are unambiguous, and also if terms are ambiguous but evidence of the parties' intent is conclusive.  *Swift & Co. v. Elias Farms, Inc.*, 539 F.3d 849, 851 (8th Cir. 2008) (citing *Donnay v. Boulware*, 144 N.W.2d 711, 716 (Minn. 1966)).[4]

Here, the Royalty Agreement unambiguously calls for MPSC's performance to continue for as long as MPSC uses Rinse & Chill, barring the occurrence of one of the termination events.  Nothing in the contract indicates the contract is otherwise terminable at will.  First and most importantly, the contract's text expresses no end date or time limit on MPSC's obligation to provide a royalty payment when it uses the Rinse & Chill

---

[4] Neither party argues that the Royalty Agreement is ambiguous or that there are questions that should be decided by a jury.

- 8 -

service.  (*See* Royalty Agreement at 1-2.)   The parties' decision to include specific scenarios for the contract's termination while not detailing an end date or time limit suggests they intended for the expressed termination events to be the exclusive methods of terminating the contract.  *See* 5 *Corbin on Contracts* § 24.28, at 315-16 (1998 rev. ed.) [hereinafter *Corbin*] (discussing the interpretation maxim *expressio unius*:  the expression of one means the exclusion of the other).   The third termination event bolsters that conclusion, because it resembles a residual, catchall method of terminating the contract by written agreement of the parties.   (Royalty Agreement at 2.)   There are also indications that the parties anticipated that the contract would continue on from generation to generation:  the second of the contract's three termination events states that the contract shall come to an end if the legal holder of the agreement dies and "no survivor or survivors of the holder(s) can be located," (Royalty Agreement at 2), and a separate term provides that MPSC shall not "restrict[] . . . the transfer of the rights granted by this agreement."  (*Id.*)  The clear premise behind these provisions is that the parties intended the royalty rights to pass to the successors of the rights holder absent unusual circumstances.

Second, the text demonstrates the parties intended the contract to continue as long as MPSC used its proprietary animal processing technique.  The contract obligates MPSC to pay the rights holder $1.50 per animal if and when, and only if and when, MPSC processes an animal.  (Royalty Agreement at 1.)  On one hand, MPSC's payment obligation is not unconditional; it can escape performance by not processing animals with Rinse & Chill.  But on the other hand, as long as MPSC chooses to use and license the

service, it must pay.  The contract specifically says MPSC's obligation continues "as long as this agreement remains in effect."  (*Id.*)  While that provision on its own may appear tautological, it takes on real meaning if the three termination events discussed above are viewed as the exclusive methods of termination:  MPSC owes the rights holder "as long as" one of the three events have not yet occurred and MPSC continues to employ Rinse & Chill.

Third, MPSC's continued performance fits with the obvious purpose of the contract at issue here – an investment contract.  Investment contracts come in varying kinds and types, with royalty agreements being an alternative to the more familiar arrangement where a start-up grants an investor equity in the company.  *See* Scott Austin*, An Alternative Financing Option for Start-ups*, Wall Street J. (Dec. 2, 2010), http://www.wsj.com/articles/SB10001424052748704679204575646940403312602. Whether a start-up chooses to offer its investors equity or a royalty payment in exchange for an investment is a matter of preference, because the approaches have differing benefits and drawbacks.  For example, a company that gives its investors equity incurs no direct costs, but resigns itself to outsiders having a say in the business, and if the company becomes worth a substantial amount, the equity holder may receive an exceedingly large return on what may have been a relatively small investment.  A standard royalty agreement, on the other hand, keeps control of the company with the founders and guarantees that the investor's return is no more than proportional to some proxy for revenue, but also requires the company to make cash payments as soon as it begins to generate revenue.  For the purposes of this case, it is enough to note that both

royalty agreements and equity arrangements are brands of investment contracts.  And just as no start-up could erase an angel investor's equity stake once the company takes a turn for success, neither is there reason for this Court to presume that a royalty stream is terminable at will unless a contract's terms state otherwise.[5]

Therefore, the Court interprets the contract to require MPSC's continued payment of royalties for as long as it licenses the Rinse & Chill service.

## B.   The Court Will Not Supply a Durational Term

MPSC argues that the Court should avoid interpreting the contract as requiring MPSC's continued performance, and suggests the Court should instead supply a durational term – that the contract is terminable at will upon reasonable notice.  But this argument reverses the steps the Court must follow when confronting a contract with a disputed or missing durational term.  In these situations, the Court's first responsibility is to interpret the contract:

> It may be that once properly interpreted, the promise means perpetual performance; it may also mean performance is to begin in a reasonable time or be continued for a reasonable time; finally, it may mean that the time was simply left indefinite with the expectation that the parties might continue performance as long as they pleased or that they would subsequently settle that term of the promise.

---

[5] Neither party argues that the Royalty Agreement's enforceability depends on the status of the Rinse & Chill patent or patents.  *Cf. Kimble v. Marvel Ent., LLC*, 135 S. Ct. 2401, 2406-09 (2015) (holding that patent licensing-royalty contracts are unenforceable after the expiration of the patent in question).

1 *Williston* § 4:22.[6]  "It is only in this last class of case" – where the properly interpreted

contract is of an indefinite duration – "that the question of indefiniteness will arise."  *Id.*

The distinction is significant because "disputes arising from **omission**" involve the

application of a "process other than that of interpretation."  2 *Farnsworth on Contracts*

§ 7.15, at 342 (3d ed. 2004); *see also* 6 *Corbin* § 26.1, at 398 (2010 rev. ed.); 1 *Williston*

§ 4:22.   Here, the Royalty Agreement is not indefinite because the contract contains

termination events and performance is conditioned on the continued use of Rinse & Chill.

The Court therefore need not consider a question of omission.

Minnesota courts have made clear that a contract is not indefinite where an

obligor's performance is conditioned on conduct that is within a party's control.[7]   And

_____

[6] The parties have not cited and the Court is unaware of any cases where the Minnesota Supreme Court has confronted a case involving a royalty agreement of disputed duration.  The Court therefore consults reliable authorities of contract interpretation of the kind the Minnesota Supreme Court would examine.  *See* Richard H. Fallon, Jr. et al., *Hart and Wechsler's The Federal Courts and the Federal System* 570 (6th ed. 2009) (stating that a federal court sitting in diversity jurisdiction, acting without the guidance of the relevant state's highest court, should "consider all the data the highest court of the state would use in an effort to determine how the highest court of the state would decide"); *cf. M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 929, 933-36 (2015) (citing *Corbin* and *Williston* as sources for "ordinary" and "traditional" contract principles); *Lyon Fin. Serv., Inc. v. Ill Paper and Copier Co.*, 848 N.W.2d 539, 542 n.2, 543 (Minn. 2014) (citing *Corbin* and *Williston*).

[7] *Benson Co-op. Creamery Ass'n v. First Dist. Ass'n*, 151 N.W.2d 422, 426 (Minn. 1967) (stating that if the obligor's performance was conditioned on the obligee remaining in the association, then the obligor could not terminate the contract at will upon reasonable notice); *see also Minn. Deli Provisions v. Boar's Head Provisions*, 606 F.3d 544, 549 (8th Cir. 2009) (citing *Benson*, 151 N.W.2d at 426) (distinguishing contracts terminable at will from contracts that are to continue as long as one party performs); *Legred v. Smeal Pork Co.*, No. C9-02-619, 2002 WL 31819222, at *2 (Minn. Ct. App. Dec. 17, 2002) (holding that contract was not of indefinite length because the pork company's payments to its marketer were conditioned on the pork company keeping a certain breed of purebred hog in its herd).

there is a strong line of authority outside of Minnesota applying the same rule to royalty contracts like that at issue here:   when a contract conditions royalty payments upon conduct in the control of the royalty obligor, that obligor can always relieve itself of its obligation by halting the conduct triggering the royalty payment.   The leading case is *Warner-Lambert Pharmaceutical Co. v. John J. Reynolds, Inc.*, which involved a royalty contract for Listerine mouthwash.   178 F. Supp. 655 (S.D.N.Y. 1959), *aff'd*, 280 F.2d 197 (2d Cir. 1960).[8]   In *Warner-Lambert*, the manufacturer of Listerine was bound by a written contract to pay Listerine's developer and "his heirs executors & assigns" a fee of "six dollars on each & every gross of Listerine" manufactured or sold. *Id.* at 660.   The contract contained no end date. *Id.*   Seventy-five years later, the manufacturer wanted out of its payment obligation and made the argument that MPSC makes now, "invok[ing] the shade, if not the substance, of the traditional common law distaste for contractual rights and duties unbounded by definite limitations of time." *Id.* at 662.   But the court was not persuaded.   First the court interpreted the contract, holding that it remained in effect despite its lack of end date because the text contemplated that the rights would pass to the developer's "heirs executors & assigns." *Id.*   Then the court noted the law's general distaste for "perpetual" contracts did not apply in this case because the royalty contract was not perpetual or indefinite.   The manufacturer's obligation was conditional – on the continued manufacture of Listerine – and therefore the company could always

---

[8]   *See* 5 *Corbin* § 24.29 at 323-24 (discussing *Warner-Lambert*); 2 *Farnsworth on Contracts* § 7:17, at 371 n.55 (same); 1 *Williston* § 4:22 n.5 (same).

"terminate its obligation to pay whenever in good faith it desires to cease the manufacture or sale of Listerine." *Id.* at 662-63.

*Warner-Lambert*'s approach was given a boost by a 1979 case where the Supreme Court allowed the enforcement of a royalty contract that lacked an end date. In *Aronson v. Quick Point Pencil Co.*, a woman and Quick Point Pencil Company entered a written royalty contract for the woman's invention, and the contract did not contain an end date. 440 U.S. 257, 259 (1979). Twenty years later, the product was still selling and the company attempted to terminate its royalty obligation. The main issue on appeal to the Eighth Circuit was whether the contract was governed by federal patent law, as the company hoped, or state law, as the woman argued, and the court held in favor of the company. *Id.* at 260-61. One judge dissented from the Eighth Circuit panel, however, taking care to note that state law would allow the enforcement of the contract even without an end date because the royalty payments were conditional:

> Although there is a canon of contract construction which provides that an obligor of a contract indefinite as to duration will be released from his duty after a reasonable time, it is somewhat doubtful that that canon would apply here – **Quick Point had within its power the ability to terminate the contract of its own accord by ceasing manufacture** . . . .

567 F.2d 757, 763 n.5 (8th Cir. 1977) (Larson, J., dissenting) (emphasis added) (citation omitted). That dissent proved prophetic. When the Supreme Court reversed the Eighth Circuit on the choice of law issue, it left in place the district court's original holding that under state law, the royalty contract could not be terminated at will. *See* 440 U.S. at 266.

Finally, MPSC cites a series of cases where courts applying Minnesota law have recited the maxim that contracts of indefinite duration are generally terminable at will

upon reasonable notice.[9]   But even these decisions note that if a properly interpreted contract is not indefinite because, for example, the obligor's performance is conditioned on some event or conduct, then the contract is governed by its terms and not by any overarching rule favoring at-will termination.   *Minn. Deli Provisions v. Boar's Head Provisions*, 606 F.3d 544, 549 (8th Cir. 2009); *Benson Co-op. Creamery Ass'n v. First Dist. Ass'n*, 151 N.W.2d 422, 426 (Minn. 1967).   Such is the case here, and the contract's terms do not allow termination at will.

Additionally, even if the Royalty Agreement had an indefinite duration, it would still be unclear whether the law's general aversion to the enforcement of contracts of indefinite length would apply.   That aversion is based at least in part on the judiciary's concern for avoiding the appearance of involuntary servitude.   *Cf.* 25 *Williston* § 67:102 (discussing the judiciary's concern with involuntary servitude); Restatement (Second) of Contracts § 367 cmt. a (1981) (same).   This concern is at its height when courts are asked to award specific performance in services contracts or to enforce a services contract for perpetuity.   Courts are understandably wary, for example, about holding an employee forever liable to an employer, *Martens v. 3M*, 616 N.W.2d 732, 741 (Minn. 2000), or requiring a supplier to supply a distributor for perpetuity, *Minn. Deli*, 606 F.3d at 549. But this concern about involuntary servitude is not at issue in a royalty investment

---

[9] *See e.g.*, *Rosenberg v. Heritage Renovations, LLC*, 685 N.W.2d 320, 326 (Minn. 2004) (services contract between real estate broker and real estate company); *Martens v. 3M*, 616 N.W.2d 732, 733 (Minn. 2000) (employment contract between employer and employee); *Benson*, 151 N.W.2d at 426-27 (marketing contract between manufacturing dairy cooperative and marketing dairy cooperative); *see also Minn. Deli*, 606 F.3d at 549 (8th Cir. 2009) (distribution contract between distributor and wholesaler).

contract with an indefinite duration because the royalty obligor's only obligation is to write a check.

Because the Court interprets the Royalty Agreement to be continually enforceable until the happening of one of the three termination events, or until MPSC stops processing animals with Rinse & Chill, the Court will not supply a durational term, and the Court finds that MPSC breached the Royalty Agreement when it stopped making payments on or about April 23, 2013. [10]

## III.   THE INDEMNITY AGREEMENT

MPSC next argues that even if it breached the Royalty Agreement, Rita must nonetheless indemnify MPSC for its breach because of the 2012 Indemnity Agreement. This argument fails for two reasons:  (1) the Indemnity Agreement is unenforceable for lack of consideration, and (2) even if the Indemnity Agreement were supported by consideration, it is not enforceable to indemnify MPSC for its breach of the Royalty Agreement.

First, the Indemnity Agreement is unenforceable for lack of consideration.  The formation of a contract generally requires not only offer and acceptance, but also consideration. *Jackson Nat. Life Ins. Co. v. Workman Secs. Corp.*, 803 F. Supp. 2d 1006,

---

[10] The parties agree that Minnesota law and not Florida law applies. The Court notes that even if there were a dispute about the choice of law, there does not appear to be an outcome determinative conflict between Minnesota and Florida law.  *See City of Homestead v. Beard*, 600 So. 2d 450, 453-55 (Fla. 1992) (refusing to presume the general at-will termination of all contracts that lack an end date, and instead opting for a more searching intent-of-the-parties approach).

1012 (D. Minn. 2011); *Feges v. Perkins Rests., Inc.*, 483 N.W.2d 701, 707 (Minn. 1992); Restatement (Second) of Contracts § 17. Consideration is something of value given in return for a bargained-for promise or performance. *Baehr v. Penn-O-Tex Oil. Corp.*, 104 N.W.2d 661, 665 (Minn. 1960). But a promise to do something that one is already obligated to do is a "mere naked promise" and cannot constitute consideration for another's promise or performance. *Hilde v. Int'l Harvester Co.*, 207 N.W. 617, 618 (Minn. 1926); *see also Tonka Tours, Inc. v. Chadima*, 372 N.W.2d 723, 728 (Minn. 1985).

In this case, MPSC had an existing obligation under the Royalty Agreement to make payments to the rights holder and to not restrict the transfer of rights. (Royalty Agreement at 1-2.) Yet when Rita sought MPSC's acknowledgment of the transfer – which MPSC was contractually obligated not to restrict – MPSC demanded that Rita agree to the Indemnity Agreement: "MPSC **needs** to have a formal liability release agreement for Rita to sign." (May 8, 2012 Ide Email (emphasis added).) MPSC's promise in return, to acknowledge the transfer, was a "mere naked promise" because MPSC already had an obligation to not restrict the transfer; the company offered nothing else in return for Rita's promises of indemnification and release.

MPSC's lone argument that the Indemnity Agreement was supported by consideration rests on a misunderstanding of contract law. The company argues that its consideration for the agreement was its consent to what it believes was an amendment to the Royalty Agreement. In essence, MPSC says that it granted the Lamoureuxs a novation by agreeing to alter who was party to the original contract. MPSC is correct

- 17 -

that a novation is a new contract that must be supported by consideration on both sides, but a novation is not what happened here.  When an obligee like Rita substitutes herself with another obligee, it is an assignment of right, not a novation.  *See* Restatement (Second) of Contracts § 280 cmt. e (1981) ("Obligees may also be substituted by assignment of a right."); *see id.* § 317 (detailing when a contractual right cannot be assigned).  Crucially, for the purposes of this case, an assignment of right "differs from novation in that assignment requires neither the knowledge **nor the assent** of the obligor." *Id.* § 280 cmt. e. (emphasis added).  In other words, MPSC's agreement to allow the substitution of the Lamoureuxs with their trust could not constitute consideration for the Indemnity Agreement because MPSC's consent was never necessary.   The Indemnity Agreement is therefore unenforceable for lack of consideration.

Even if the Indemnity Agreement were generally enforceable, it would not be enforceable in this instance because courts require clear and unequivocal language before allowing a party to insulate itself from its own breach of contract.  *See Milnot Holding Corp. v. Thruway Produce, Inc.* No. 08-6140, 2014 WL 993743, at *4 (W.D.N.Y. Mar 13, 2014) (refusing to imply indemnification rights for a breaching party); *Facilities Dev. Corp. v. Miletta*, 584 N.Y.S.2d 491, 494 (N.Y. App. Div. 1992) (requiring a clear statement before enforcing breach of contract indemnification clause in favor of the breaching party); *cf. Yang v. Voyagaire Houseboats, Inc.*, 701 N.W.2d 783, 791 n.5 (Minn. 2005) (requiring a clear statement before enforcing an indemnification clause to

insulate a party from its own negligence); *Nat'l Hydro Sys. v. M.A. Mortenson Co.*, 529 N.W.2d 690, 694 (Minn. 1995) (same).

Here, MPSC relies on a residual clause in the Indemnity Agreement requiring Rita to indemnify MPSC for "any and all claims . . . related to or arising from the Royalty Agreement."  (Indemnity Agreement at 2.)  MPSC reads this clause to require Rita to indemnify the company for its breach of the Royalty Agreement.  This result is not only not clearly required by the text of the contract, but would also lead to an absurd result. The parties drafted the Indemnity Agreement while focused on the transfer, not the enforcement of the Royalty Agreement, and MPSC pushed Rita to sign the Indemnity Agreement to mitigate the risk it perceived in the transfer.  (*See* Indemnity Agreement at 1-2 (discussing the transfer repeatedly in recitals and affirmations); May 8, 2012 Ide Email at 2 (discussing the indemnification in the context of the transfer's legal risks to MPSC).)  Rita signed the Indemnity Agreement because she wanted to continue receiving payments under the Royalty Agreement, and to secure those payments with the family trust.  MPSC's counterintuitive interpretation of the Indemnity Agreement would have Rita agreeing to a contract that effectively nullified the Royalty Agreement, purportedly for the very purpose of ensuring that agreement's vitality.  That cannot be what the parties intended, and the Court will not interpret the contract to lead to such a result.  The Indemnity Agreement cannot be invoked to protect MPSC from its breach of the Royalty Agreement.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     The plaintiff's Motion for Summary Judgment [Docket No. 32] is **GRANTED**.

2.     The defendant's Motion for Summary Judgment [Docket No. 38] is **DENIED**.

**IT IS FURTHER HEREBY ORDERED** that:

1.     Within twenty-one (21) days of the entry of this Order, the plaintiff shall meet and confer with the defendant to ascertain whether any disputes exist regarding damages.

a.     If the parties agree on the amount of damages owed to the plaintiff, the parties shall submit a stipulation to the Court regarding such damages.

b.     If the parties are unable to agree on the amount of damages, within twenty-eight (28) days of the entry of this Order, the plaintiff shall submit to the Court, and serve upon the defendant:  (1) a letter brief not to exceed 3,000 words regarding its damages calculation; and (2) documentation supporting its damages request.

c.     Within seven (7) days after service of the plaintiff's letter brief, the defendant may submit to the Court, and serve upon the plaintiff:  (1) a letter brief not to exceed 3,000 words raising any objections it may have to the plaintiff's damages calculation; (2) a request for a hearing, status conference, or trial

regarding the issue of damages, if necessary; and (3) documentation supporting its

objections and request.

DATED: December 7, 2015
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court